May it please the Court, Peter Stris on behalf of the County of Hillsborough in Florida and the County of Salt Lake in Utah. I'd like to focus this morning, Your Honors, on my client's claims that are based on tampering software installed by Volkswagen in in-use cars months or years after those cars had first been sold. Those claims, which are based on what I'm going to call as a shorthand recall tampering, were dismissed on the pleadings by the District Court entirely on implied obstacle preemption grounds. And my core submission here today is that that preemption holding was wrong and warrants reversal. Counsel, what's your client getting out of the plea agreement that resolved the criminal and civil penalties? So my understanding, and I will confess that I'm not 100% sure, but my understanding is that my clients have not gotten anything out of that. There is part... There was a provision for money to go to the state. Yes. Doesn't that include then trickling down to clients like the counties? So what I was going to say is my understanding is that in, I think it was the second notice of consent, part of the settlement was a mitigation trust fund that went to the states, but the states control how much, if anything, go to the counties. But it's a big number, right? And in total, it's several billion dollars. Well, I think it's actually a very low number relative. If you break out the parts, $10 billion of the settlement is essentially to consumers. So it has nothing to do with this. What's relevant... The people who actually bought the cars, right? Absolutely. But I'm talking... And they get, I'll call it restitution. I'm not... That may be the wrong term, but that was part of the negotiated deal with the feds. Correct. But to your question, I think the relevant analog are the civil penalties because they're the ones that go to arguably remediation of the environmental impact. And there was $1.5 billion total. And that $1.5 billion comes out to about $2,500 per vehicle. And I'm going to get to that later. If that's the case, if you're getting a cut of the pie as a result of the federal settlement, then why should we not determine that allowing your claims to go forward is actually interfering, as the district court thought, with the federal enforcement action that has been resolved by negotiation? So I think there's a number of reasons, but at its core, I think that turns implied obstacle preemption analysis on its head. And I'd like to start there. The district court, and I think this is a premise kind of of its opinion, got the standard backwards. Instead of analyzing whether or not the CLEAR Air Act shows the clear and manifest purpose of Congress to strip my clients of their traditional police power. I don't think anybody's arguing that those claims are not addressed by conflict preemption. I think the issue is whether or not they're preempted by implied preemption. Absolutely, Judge Talman. And my point is that the first place that you start in trying to understand kind of the scope of the regime is with the text of the statute. And there, I want to be very clear on this. The district court opinion, and this is surprising to me, made no mention of 42 U.S.C. 7416. This is a provision that this court described as a sweeping and explicit provision entitled retention of state authority. And I'd urge that you look at that provision. It's very general, and the issue here is pretty specific as to whether the states, with their anti-tampering regulations, can impose additional penalties for something that the EPA is already imposing penalties on pursuant to a statute that says no more than a certain amount. Okay, well Judge Ikuda, that seems to be what is concerning both you and Judge Talman, so I'll take that head on. I think that my answer would be that the remedies provision that you're talking about, that's 42 U.S.C. 7524, is best read as only setting boundaries for federal violations. Why should that be? Well, so what I'm going to argue is that as a matter of fact, there are many indications that the federal system is aware of and tolerates concurrent state remedies. Let me give you some examples. Just bear with me on this. So I would start with the consent decrees themselves. There's three of them. Each of them expressly states, and I'm going to quote, that it does not limit or affect the rights of defendants or of the United States against any third parties not party to this consent decree, nor does it limit the rights, limit the rights of third parties not party to this consent decree. That's number one. It's paragraph 96. Number two, the EPA has told stakeholders for years that they face additional fines from states. If you look at page 44 of our brief, note 131, we explain where this has happened. Number three, the EPA has repeatedly... But weren't those statements addressing individual vehicles? In other words, if a car is tested at an emission station and it's out of compliance and it can't be fixed by a mechanic, a fine can be imposed for the vehicle. I don't think so, Judge Talmadge. I kind of wanted to address this first, but you guys took me to the remedies provision. I think that's probably the biggest fallacy that Volkswagen has put forward, so let me explain why I say that. That's a key justification for Judge Breyer's finding in finding that this was an obstacle to the federal enforcement. A critical justification, and so I'd like to take that... That's why we took you to it. Yeah, I appreciate that. I didn't mean to ask you to talk to us about that. It didn't seem to me that anybody else was talking about it, but that seems to be a critical part of what he was talking about. I think it is probably the critical part, and here's how I view it. So for decades, I think the following, my friend from Volkswagen, would not dispute. For decades, the Clean Air Act, many states, and many local governments have all prohibited and concurrently penalized tampering. Now, where we part company, and this is to the question, Volkswagen argues and convinced the district court that somehow the federal and the local anti-tampering provisions cover different ground. It's kind of this model-wide manufacturer on the one hand, focus, and individual on the other. I didn't see anything in the statute that differentiated between model-wide or not model-wide post-sale. So not only is that absolutely right, and I'd like to talk about the text in a moment, but I want to take on Volkswagen's argument on its own terms as an empirical matter, because I think I can defeat it there. So as you say, just like my client's local anti-tampering provisions, the federal provision applies to, quote, any person. And when you're talking about after sale, there's a knowledge requirement. It's not focused on manufacturer or systemic conduct. But if you look at the history, if you go to the EPA's website, the EPA's enforcement has been heavily focused on non-manufacturer, non-systemic conduct. Last year, 2018, there were 30 federal enforcement tampering actions. Twenty-eight of them didn't involve manufacturers. They involved local repair shops, dealers, local trucking companies, aftermarket product sellers. The premise that the focus of the federal system is on manufacturers or systemic conduct is wrong. Now, I think the Volkswagen, because they're aware of that, actually relies on a different set of provisions in the statute. And that's, I think, what pushed Judge Breyer to think that there was a conflict. And I think that's actually important for me to address. So essentially, Volkswagen focused on 7541A and B, what I'll call the EPA useful life testing provisions. And I think this is very important. Because to your question, Judge Ikuda, there's absolutely no text in the Clean Air Act that prohibits states from regulating in-use manufacturer tampering. And we think that's an important starting point, because we know that Congress knew how to restrict manufacturers, as we cite in our brief, page 41. We have section 7541H that prohibited states from requiring certain testing by manufacturers. So Congress knew how to carve an exception out for manufacturers. So we are looking at implied. By its terms, it seems like this would fall within the savings clause. But to the extent there's something more specific that carves out for only the EPA the imposition of penalties for defeat devices, then why wouldn't that just wipe out all state tampering regulations, not just fleet wide, because I didn't see anything distinguishing? Why couldn't we read this very narrow provision, giving to the EPA the right to impose penalties or to regulate defeat devices on any post-sale car would just replace all of the state's tampering regulations? I think most states have some anti-tampering. 45 of 50 states, yes. So it would just replace all of them with this language. Why shouldn't we read it to do that? I'm not sure I know which language you're referring to. In 7524? 7524A, I guess. 75? 24A imposes civil penalties on someone who violates the 75, I'm losing it, 22A3, I'm losing it, 22A3A and B, which is the installation of the defeat devices, even post-sale. So I read 75, you can correct me if I'm giving the wrong numbers. I read 7522A3A and B as applying post-sale to post-sale vehicles, precluding the defeat devices and tampering, post-sale tampering, and then 7524 read with that says it's up to the EPA to penalize that behavior, those violations, and that, if you read together, you could read it as conflicting with all the anti-tampering rules in all states. Sure. So I think there's a few problems with that argument. So the first one is that the cross-reference you're talking about, 7522A3A or A3B, I don't think they're restricted to in use or not. It actually has two clauses to it. It applies to both pre-sale, it just doesn't have a knowledge requirement, and in use. So your argument, I think, proves too much because if I accepted it, it would essentially make the EPA the exclusive regulator of all tampering. That's the first problem. Right. The second... So you're saying this applies to all tampering with air pollution control devices. Well, it's even broader than that, Judge Ikuda. We're focusing on the reference in 7524A to 7522A3A and B, but there's also references to 7522A2, basically all of the prohibition sections. So I think really the only sensible way to read this is as there's a bunch of things that are prohibited in the prior section. Many of them, whether it's not having a certificate of conformity, not reporting correctly, installing a defeat device, tampering, come with civil penalties. This is the provision that explains for the federal civil penalties what the contours are. And I think my reading of that is strengthened by the B section, right, because 7524B gives guidance to a district court in determining how to exercise judgment in assessing what the penalty is. And if you look at the factors, the last two are the effect of the penalty on the violator's ability to continue in business and such other matters as justice may require. The reason I think that's important is there is a long history of simultaneous regulation by states and the federal government, localities and the federal government, of tampering and a host of other things that I think would come at issue here. So, well, it appeared to me that what bothered Judge Breyer was the prospect of ruinous pile-on state enforcement actions where the company has paid, and I'm not trying to justify their conduct, I mean, it was wrong, and I understand why they pled guilty and paid huge fines. But if the federal statute acknowledges whether or not the defendant is essentially going to be run out of business, then why was Judge Breyer wrong in finding that permitting your actions to go forward would result in ruining a huge corporation? And that is where the obstacle arises with regard to the Federal Enforcement Act. Well, so I think for a few reasons. First and foremost, that turns preemption analysis on its head. It takes a policy concern and attributes it to Congress. I think that, basically, as an empirical matter, if you're a member of Congress, for example, looking at this regime, you have no reason to believe that the parade of horribles that has been hypothesized here is going to happen. The fact that... Yeah, but, well, I don't know the exact number, but to be fair, Judge Talman, the total civil penalties that were pled in the Department of Justice's case... I'm not talking about the department. I want to know what you're seeking. What are you going to ask the trial court to do if you prevail on your claims? The damages... Wouldn't the county's liability on their own be permitted to impose a penalty in excess of $11.2 billion? That may be, just as the... And in comparison to the $9.23 billion that the federal and federal criminal and civil penalties has received? And that's just two counties? But I think... What are we going to do with all the counties? I think, well, in fairness, Justice... Judge Smith... No justice in the Ninth Circuit. I don't think that's true. I think we're mixing apples and oranges, and this is the answer I was trying to give to you, Judge Talman. You're taking the amount that we could get, and you're comparing it to the amount that was settled for in the federal regime. And what I'm telling you is, the amount that the federal government could have gotten actually would have exceeded a trillion dollars if you look at their complaint. Well, without regard to what Volkswagen was facing federally, the number's a big number that they agreed to pay, and now you want to come along with an even bigger number and pile on. And as Judge Smith just pointed out... There are more than 3,000 counties in the United States, and we have two before us who are now looking for hundreds of millions of dollars in damage. Let me take on... With respect, I think this policy inquiry puts the preemption analysis on its head, but let me take it on directly. Let me take it on directly first. So the regulations that states are allowed to impose are based upon cars that are within their borders. So if you have a state or a locality that has a lot of cars that were there, they suffered serious damages. Let's take Hillsborough. Hillsborough, this is in our complaint. Didn't the federal enforcement action recognize that and take into account, with regard to the settlement, reparations, restitution, whatever you want to call it, to the individual owners of vehicles nationwide, and a substantial amount of money being paid to the states? There's absolutely... To compensate them for these violations. With respect, Your Honor, there's absolutely no evidence of that, and in fact, every bit of evidence to the contrary. But the evidence is that you're getting the cash. I mean, what more evidence do I need? The states are getting cash, and there are certain states, as was pointed out in an amicus brief of Harris County, because they and Texas are bringing a similar claim, certain states settled claims like the 177 states like tampering claims against Volkswagen. So if we really want to take this on as a straight... In the settlement with the EPA, so if you really want to take this on as a straight policy matter, which I do think is backwards, and I'd like to get to that in a second, I think we're right on policy. Because what you have is a settlement that has a trust fund that goes to various states, then you have other states that were able to settle for more, just because they happened to come to the table, and yet... But if you run Volkswagen out of business, how is the federal government going to get its money to effectuate a settlement over a 10-year period? That's not fair, Your Honor. We're not going to run Volkswagen out of business... We're all about fairness here, and the question is, why is it wrong for the federal government, and in this case, Judge Breyer, to consider what the impact of allowing your litigation to go forward will be in undermining the efficacy of the federal settlement? So I think your question kind of answers itself, in my view. Volkswagen's operating profits in one year were $10 billion. The egregiousness of their conduct, which led... So they can pay your client $11 billion, and you'll be happy and go... But there's no reason to believe that that's, in fact, what's going to happen. We have a settlement agreement with the federal government that reserves claims of third parties. Let me just get... Let me get back to the legal question, which is, if the panel determined that claims of, like the county's anti-tampering claim, are preempted, what effect does that have? Because we can't just say it's preempted in this case because we're worried about the cost of Volkswagen. We have to look at whether Congress actually intended preemption. What are the effects of that? Does that mean that every state is precluded from bringing any tampering claim? I think, Judge Yakuta, the effects are staggering, and here's why. Clearly this does not run afoul of the express preemption provision because the new tampering devices were installed in vehicles that were in use. So we're in the world of implied obstacle preemption. If we take this free-wielding inquiry, and I, with due respect, I think it is free-wielding. We have doctrines like the excessive fines doctrines that exist to police against the concern. I think that you're really articulating, Judge Tolman. But if we take... Free-wielding is not exactly right because we got right there a clear and manifest intent that the manufacturers be subject to a civil penalty of not more than $25,000. Well, I see my time is ending, and so I... Yeah, but just a minute. And we also know that you state, the counties have determined that tampering is so serious and so much harm that the public health to the fine of up to $5,000 per day is appropriate. And all we're trying to do is understand if what Congress has done with this hard cap in 7524A preempts what you want to do. I understand. And that's all I'm asking. Can I give you my best... I see my time has run out, but can I give you my best answer? Here's my best answer, and I believe this wholeheartedly. If you take what the EPA settled at, and that's what you've done here, as a proxy... All I've done is I've taken what the EPA settled at, and I haven't said whether it was good or not. All I've said is, what can the states get from that? I understand. I got $166 million for Florida, and I got $35 million for Utah. And then, doesn't that further establish an understanding that the federal government is solely responsible for enforcing this? All I'm trying to do is look at your preemption argument, which was my original question. If you want to talk about what it is that they settled for, I got a lot of questions about that. But take the preemption question. I want to answer that head on. There's two ways to think about this. And I submit both of them show the error of this thinking. The first is if you look at what the EPA settled for. If you look at that number and say, whoa, what states could get is a multiple of that, then in every case, you're assuming that the judgment of what EPA settled for represents the total amount that should be available to the infringer. If alternatively... If alternatively... The argument is that the EPA settled, and as a part of the settlement, there was sufficient money, and I quote, to fully mitigate the total lifetime excess NOX emissions from the 2.0 liter vehicles. And then it says that the states can participate. All they've got to do is ask. I'm just reading what the consent decree says. But let's eliminate that problem. Why is it that I can't find there's a clear and manifest intent here for a civil penny of not more than, and say the Fed said that's what we're going to do in this particular action, coupled with the idea that we have to take into effect in this the gravity of the violation, the economic benefit of this or savings resulting from the violation, the size of the violator's business, the violator's history of compliance with the subchapter, action taken to remedy the violation, the effect of the penalty on the violator's ability. So why is it not then preempted? Indirectly preempted, not expressed. There's a lot of pieces there. If I could take them one by one. So first, you talk about the consent decree. I think that provision was taken out of context. There are other provisions in there that make clear that there was a belief that there were other cases and remedies that could be brought. Now to your point about the various elements that a court takes into account, that cuts in our favor because for all we know, the EPA took into account that there were existing pending state cases with substantial liability out there and said we're going to settle for a smaller amount under federal law because there are individual counties that were heavily affected by this and that are going to police their own law. The problem fundamentally with the implied preemption analysis that you put forward is that you're dealing with a regime that for decades has had concurrent enforcement by states and the federal government. And there's no limiting principle. It's not on a class-wide basis. We're talking about going after a dealership in Hillsborough County that has been routinely helping its customers evade emission control standards by tampering with the emission control equipment. That's sort of the typical tampering cases. I just think that's wrong. California enforced against Honda in 2016. Both the EPA and California enforced against Ford. California's a different animal because of the fact that Congress essentially, I don't know, is the federal enforcer for clean air regulation. So first of all, it's not a different animal for implied preemption. It's only for express preemption of standards. But I'll give you another example. Florida is a non-177 state. It enforced along with the EPA against Fiat in 2019. This is a fiction with no evidence behind it that VW has put forward, the notion that the federal government deals with the big cases and the states deal with the small cases. We have several decades of concurrent enforcement, including of this type of manufacturer conduct. And look, Judge Smith, I'm sensitive to the fact that courts have to be worried about fairness and crippling liability. But that is what excessive fines jurisprudence deals with. That is not baked into a preemption inquiry in a statute where there is no evidence that Congress intended to create a specific exception for model-wide manufacturer conduct. If your argument is correct, it would apply to... I asked the question. If the premise of your question were accepted, it would apply to every action. It would apply to actions not just that were systemic against manufacturers, it would apply to small cases. It would certainly apply in this particular instance that has to do with tampering with these particular provisions, 42 U.S.C. 7525. Right. It would apply to every tampering case. It would apply to tampering cases against individuals, because an individual would say, oh, the federal government came after me and they got $15,000, and now the state's going to come after me and they're going to get $28,000? I guess the civil section says only the EPA can enforce it, only the administrator. So does that mean that states would not be able to bring those actions at all? They couldn't recover any penalties because it says only the administrator may commence a civil action. We're talking about 7524? 7524, yes. Right. 7524 is explaining the action and the remedies that can be brought under the federal statute, and 7524C actually gives the administrator an alternative to not even bring an action, but just pick a number as long as it's up to $200,000 and levy it. If 7524 is the source of the preemption of the anti-tampering, then the states couldn't bring any actions at all, even against the local garage. Is that right? Yeah, that's right. 7524 is not the source. I agree with that characterization, yes. We've taken you well over your time. I'll give you a minute for rebuttal. Thank you, Your Honor. Good morning. Good morning. Robert Schiffro with Sullivan and Cromwell for the Volkswagen Defendants, and I actually was the lawyer who negotiated those settlements. Let me start with some basic propositions. In the history of the United States, a county has never sought to bring an environmental enforcement action against an auto manufacturer, full stop. Judge Breyer was completely correct in holding that Congress did not intend for 49 states, California is separate, plus 3,000 counties to bring enforcement actions against manufacturers for issues relating to the emissions control system in the vehicle, both when it's manufactured and updated. You said counties. The opposing counsel was talking about Florida and California, so states have brought that sort of claims against manufacturers? That was a misstatement. What states have done is they brought consumer claims against manufacturers for false advertising, and that when he referenced fiat, that was the fiat settlement. In the Volkswagen settlement, Volkswagen settled with virtually all of the states as part of a comprehensive settlement on their consumer false advertising claims, and no one has made the argument that those consumer advertising claims are in some way preempted by the Clean Air Act. The issue is with respect to the environmental claims. Opposing counsel also says there's a history of concurrent enforcement of these air pollution control device issues, or I may be more specific or misstating it, but something along those lines. Do you disagree with that? Yes, very much. The only state that has been engaged in the enforcement has been California, and that's because in 1967, when the auto emissions provisions were first put into the Clean Air Act, California was the only state that was involved in that exercise, and Congress expressly allowed California to continue subject to EPA review, and then other states can join California, again, subject to EPA review. So, the argument is that that only frees California from express preemption to go against new cars, pre-sale cars, but doesn't affect this implied preemption for post-sale cars. Do you disagree with that? Yes, I do. In the way that it's been viewed, and in fact in the settlements that have gone on, both before Volkswagen and then the Fiat One afterward, California was intimately involved, because California is involved post-sale. You have to remember that an auto emission system is something that is an evolving system on a car. It's a computer that is developed, and then the statute expressly contemplates that there will be EPA regulation of that computer system post-sale, so you have an obligation when you're a manufacturer to give warranties and also be subject to maintaining that system over the useful life, which the statute specifies to be 10 years, and is now in regulation 120,000 miles. And so, right now, if you're an auto manufacturer and you want to update your software post-sale, you have to go back to the EPA, and CARB is involved, that's California Air Resources Board, is involved in that process. Similarly, in-use verification testing, meaning they have to test... Well, I'm not sure what this is getting at. I mean, here, I thought the allegations were that there was not only a recall to make the Defeat device work better, but there was actually, in ordinary maintenance at the dealer, the Defeat device was being fixed in order to work better. Now, what happened was, in 2013, California and EPA were working with Volkswagen and raising issues about the emissions control system in the vehicle, and so many of the vehicles had already been sold at that point. Pursuant to their statutory authority, Volkswagen was submitting to testing. Volkswagen then proposed, and EPA in California approved, an update to the software system. The other side says, well, that was just an improvement on the Defeat device. But it was all done pursuant... It was that the steering wheel would be adjusted, would help the Defeat device work better. That's the allegation that's been made, and Volkswagen, in fact, paid penalties for tampering with the vehicle. That's in the statement of facts that Volkswagen agreed to. That's in the statement of facts that Volkswagen stipulated to. We agree with that. We agree with that statement. There's no... We're not trying... I'm not trying to defend it, but what I'm saying is the process of the change that was made was done under the supervision of the EPA. Did Volkswagen lie to the EPA? Absolutely. We don't dispute that. But it still was done with the EPA. Counties weren't involved. The only state that was involved was California. Now this point about the penalties is important to keep in mind. Clearly the county penalties that they're proposing here would clearly impact the calibration of force that would be specified in the statute. Let me ask you, just putting aside how much the penalties are going to be, because to find congressional intent in the statute as it exists now, not with a foresight about it, maybe some odd thing might happen. And so when I look at reading 7... I guess this is 7-5. I don't know. I can't remember. There's 7-5-2-2 and 7-5-24 together. It would seem that it would, if we said that preempted the ability of a state to impose an additional penalty for this sort of post-sale tampering with a defeat device, then that would apply across the board, and no state or county, no non-federal entity could impose penalties for anyone for a defeat device, because I didn't see for tampering. Because I didn't see anything that differentiated between a manufacturer or a... the local garage or a whole fleet of carts, as Judge Breyer thought, or just an individual car. So is there a way to say Congress preempted what Hillsborough is trying to do, but doesn't preempt states generally from imposing penalties on entities that tamper with defeat devices? Well, the six other state courts, and federalism issues are obviously at issue here, have agreed with Volkswagen that... Right, but could you answer my question about the statute? Yes. As we read the statute, the only state that can impose penalties would be California and potentially the 177 states that are following... Are you agreeing with me that this would... Reading 7524 and 7522 together would mean that states and counties, and no one except for the federal government and California, or maybe you're suggesting... I'm not sure of that because I haven't analyzed the effect of the 177, but could impose penalties for tampering. Is that your position? Yes, and that's based on several things. Number one, we actually do believe that if you look at section 209A, and when Congress spoke about no state or political subdivision attempting to enforce any standard relating to the control of emissions from new motor vehicles, that that relating to, as the Supreme Court said in Morales, should be given a broad purpose, and that... Other than the D, the savings clause, it seems like what Hillsborough County is doing by terms would fit within the broad language of D, because A just relates to new cars, and these are post-sale cars, and so it seems broadly D would apply and would save what they're trying to do. No, because if you look at D, what it says is use, operation, and movement. Manufacturers are not engaged in the use, operation, or movement of vehicles. Plus, the legislative history, which we cite in our papers, makes it quite clear that when allowing states and localities to do things like carpool loans... So changing the effect of the defeat device in a used car does not control or regulate or change the operation of that car. I'm finding that hard to accept. We think you need to look at the words use, operation, and movement together, and use, operation, and movement suggests driving the vehicle, but if you look back again at what a conflict pre-entry case like this, clearly you have to look at all the different provisions, and there are a series of provisions that we cite that provide for federal regulation post-sale with respect to the computer system dealing with emissions. Those are all about recalls and fixing them. This, what Volkswagen did according to its statement of fact, was to make the defeat control devices more thoroughly. It was an update to the software. In fact, in the Wyoming case, they actually said it reduced the emissions, but the point that we're saying is that that change was done pursuant to... You had to get the approval from the EPA to do it. We lied to the EPA. We're not disputing that. We paid a penalty to the government for doing so, but there's... It was also done by the individual manufacturers during routine maintenance. No, there was a... According to the facts. When cars are updated, whenever you bring your car back in, if there's an update to the software and the emissions system, it's done on a vehicle or class-wide basis in a garage. You're not giving a direction calling Joe's Garage in Anchorage and saying, change this single computer system. It's done nationwide, and the allegations in that... Every dealer... Because the cars weren't recalled. It was just when people chose to bring their car into the dealer to get maintenance, it was done by the dealer, presumably without telling the owner, perhaps. There's nothing in the facts about that. But had that person chosen to bring the car into Joe's Garage, then it could have been done, perhaps, if they had the secret code or not done. This was done on a model-wide, class-wide basis. What about the ones that were just brought into the manufacturer for routine maintenance? It would be done automatically. So even now, if you have a car, it could be General Motors or some other car, and if it has an emissions control system, those emissions control systems are constantly being updated post-sale, and that is all being regulated by the EPA. And what the other side is doing is saying, well, counties, two counties in America should be involved in that process. Well, the one thing the Clean Air Act says is that in 7541H1, that a state or locality certainly can't require a manufacturer to do any testing. So the whole premise here is all that Salt Lake and Hillsborough are doing is piling on what was done by the EPA and CARB. And to take it to its logical conclusion, in our big settlement with the EPA, the EPA approved – and CARB – approved doing an update to the software, which improved the emissions system, but it did not take the cars up to the certified original standards. This was a Solmonic settlement, because you didn't want to have all these cars going to no use. And under their theory, a county could come in and say, no, we don't like that EPA-sponsored settlement, and we want you to get penalties because you haven't taken the car up to the originally certified standard. So allowing a county to impose a penalty to a software update when it's being done pursuant to federal government authority clearly raises a serious question. There were a number of numbers that were thrown around before. The highest conceivable federal penalty – and the statute has now gone to $37,500 – for 600,000 cars is $20 billion. What they are seeking is – they're seeking $11 billion per year over theoretically a number of years for just two counties in the United States. In terms of what Volkswagen did, Volkswagen paid $4.3 billion in penalties to the federal government. It paid $3 billion to a remediation fund that, as Judge Smith noted, was intended to fully So, I guess, how does then the hard cap for the tampering violations, how does that figure into this preemption? Because I guess I've not heard that from you yet. I read through your brief. You didn't put it in your brief. And yet, when I looked at the hard cap, it seemed to be something that – or do I just ignore it? I think the hard cap is very important. It's an argument we made. But you didn't make it. Perhaps we should have put it on the first page of our brief, Your Honor, and I take responsibility for that. Well, perhaps you should have put it on any page. Well, Your Honor, I think if you look at the Supreme Court decision in Crosby, which is I mean, the only place I found it was in the good judge's district court decision, not in your brief. Well, now I get to the hard cap and you don't argue it. So, can I really look at it? Yes, you can. And we think the hard cap is obviously critical because it says not more than – it's now up to 37,500. Congress clearly was intending – and we have it a lot in our brief about penalties. The Crosby case was a situation where Massachusetts wanted to impose additional sanctions, Burmese sanctions. And the Supreme Court said that those sanctions would be at odds with the right degree of pressure to employ. In that case, the President had imposed certain sanctions on Burma and the state was not allowed to do additional ones. In a case called Gould, Supreme Court case – So if we're just looking at domestic cases – so in Arizona v. United States is the one that you cited where the court found this implied obstacle preemption. And there they said we don't want the states to use a different method or technique of that because that would be an obstacle to the system that the government had in mind for immigration law. I don't think there was a savings clause, as there is in this case. Here, it wasn't clear to me whether imposing additional penalties was a different method or technique. What's your best argument that it is a different method or technique? Or is there a case – domestic case with a statute similar to this where there is a express preemption and a savings clause where the court said imposing additional penalties for the same action is – stands as an obstacle? As I would cite the courts of the Gould case, 475 U.S. at 288, 1986 Supreme Court, where the Supreme Court held that a supplemental state sanction for a violation of a federal labor regulation was a supplemental sanction and would conflict with a federal regime. And in this case, if Volkswagen had had to go out and negotiate with 3,000 counties, we would have needed a building far bigger than this courthouse to negotiate with all the folks, and it would have been impossible. But that's specific for your case. I mean, if the preemption with the 7524 and 7522 applies everywhere, it could – it would apply to an individual – to Joe's garage, as you hypothesized. If they tamper with an air pollution control device, they remove the wires, the state couldn't enforce that, right? It would have to be the EPA. And they could certainly fit into one room. With respect to an individual car. But clearly, the whole purpose of the Clean Air Amendments over the course of those amendments since 1967 has been that the federal government deals with auto emissions because cars cross state lines and it's an interstate problem. It's not something that happens intrastate. That's reflected throughout the legislative history of the statute. I didn't see anything fleet-wide. I know Judge Breyer discussed that and said, well, this is on a model-wide basis. I can address that. If Your Honor would look at 7541C1, okay, it talks about how the EPA has the ability to recall a substantial class or category of vehicles. So class or category is the same as model. Plus, if you look throughout those provisions that we're citing – How does that affect the defeat device issue? I mean, obviously, they're looking at new cars and recalling recalls. That was in your – I thought well-briefed in your briefs. But this isn't one of them. This was – this is not targeting a recall to improve a problem. Well, I think that – I think – to go back to what happened. In 2013, Volkswagen was under investigation by the EPA and CARB in an attempt to address the issues with respect to its audi emissions. It proposed doing this software update. Yes, they alleged the software update made this defeat device work better. But that process, the sending of that update to every dealership in the country was done under the auspices and pursuant to statutory authority of the EPA and is something that is contemplated in the Clean Air Act. So this was – and when Volkswagen lied to the EPA, it had to pay a penalty, and Volkswagen actually has paid up to $23 billion in the United States for the cost of doing this. And by the way, the company's total market capitalization is $80 billion. So it's not as if – and I think another point that needs to be underscored is that Section 7524C2, which we certainly did talk about in our brief, talks about what factors  All Hillsborough says, or Salt Lake, is we can do 5,000 per day, and the particular provisions – gravity, economic benefits, size, compliance, history, remediation, ability to pay – those are specified in the statute with respect to how car companies should be penalized for engaging in wrongful updates. In addition, there's a penalty policy – I'm sorry. Where do I look in the record to see that Volkswagen did all of the tampering with the defeat device to make it work better pursuant to EPA authority? I believe, Your Honor, if you look at the statement of facts in the guilty plea, I believe it is there. I believe it's also in the various settlement agreements we had with the EPA, which are also in the record. And one of the charges that Volkswagen settled to was lying to the EPA in connection with those updates. And in fact, those updates are referenced in some detail in the criminal guilty plea statement of facts. Counsel, let me ask you a question about the settlements. Is there any provision in either the settlement agreement or the consent decree that addresses any potential follow-on actions by state regulators? Not that I'm aware of, no. The only follow-on actions or actions by states that we had that we dealt with were the consumer actions, which we've settled. Then there were environmental cases that were brought. And those were part of the big settlements that were overseen by Judge Breyer in 2016 and with Director Mueller involved. And those involved California and the 177 states. Now, the other side says, why did you settle with California? That's because California has a big history of being involved in this since before the they were expressly carved out in the Clean Air Act. And to the extent states are following California, we did not litigate that issue. So there was no attempt to obtain what I will call immunity or declinations of intent to prosecute from the states as a quid pro quo for the hundreds of millions of dollars that the states are going to receive? No. The only thing that states, when states agree to take the money and it's $3 billion goes for remediation. States can't play games with the re-registration of vehicles, even those that don't get the so-called fix. But again, remember, the fix that we... You say play games, but there's no language in the agreement that addresses that, is there? No, no. And I think we fully understood that there would be some states that we'd litigate with. And in fact, we have litigated with a number of states. And we've won everywhere except for Texas on all of these issues. And the only place we've lost with Texas is on this update claim. And I would just want to make a point. We actually do take the position, Judge Breyer disagreed with us, that Section 209A, the express provision, deals with this as well as conflict preemption. We think that, again, if you look at cases like Bucknum and Guyer, those are cases where there were express preemption provisions, there were savings clauses, and the Supreme Court in Bucknum, which was a case by Chief Justice Rehnquist, said, well, you couldn't have a state fraud claim based on fraud against the FDA. Well, Hillsborough County and Salt Lake are not doing anything other than piggybacking on what the federal government did and say we lied to the federal government in connection with the software updates. And therefore, we should pay them $11 billion per year. So this Court should affirm Judge Breyer's well-reasoned decision. And we think it's fully supported by the text, history, structure of the Clean Air Act. Thank you. Thank you for your argument. We'll give you a minute for rebuttal. Thank you, Your Honor. Three very quick points. First, there's no principled limit to Volkswagen's implied preemption argument. Their reading of 7522 and 7524 would impliedly preempt any state tampering prohibition against anyone that got you money. That's been the law for decades. It would undo it. And I think notably, the United States and the EPA did not file an amicus brief at any point here and participate. And I think that silence speaks volumes. Number two, all cases, including Gould that my friend mentioned, that found a supplemental state remedy preempted were field preemption cases except Judge Acuda for Arizona versus the United States. And in Arizona, that is a totally different situation because a narrow majority of the Supreme Court found that there was clear legislative history that Congress had rejected a particular category of remedy, namely criminal punishment. So it can't possibly be the read on which you get preemption in this case. And what I would say is if 7524, which was not briefed, Judge Smith, by Volkswagen is the basis for the court's decision, we would like the opportunity to supplementally brief that. And then very quickly on the settlements, the settlement that you mentioned, the one where the EPA settled and found that it would fully remediate Judge Smith, that it's critical that I explain this. Environmental damage and remediation is different from civil penalties. Civil penalties are not to remediate. They're penalties to deter. And that's why it's so important, Judge Tailman, that look at, I urge you to look at paragraph 96 of the third consent decree. They omit that from what they put in the supplemental excerpt of record. It carves out third-party claims. And that is critical because if you look at the settlement agreement with states, and I'm looking at one here that Utah signed, Volkswagen specifically carved out, quote, any claims arising under state environmental laws and regulations and or anti-tampering provisions. They knew that that is paragraph, it's page 9. It begins on page 8. It goes on to page 9 of the settlement agreement between Volkswagen and all of the states that are signatories, and Utah and, not Florida, Utah was one of the signatories. Florida is not a signatory, right? Yeah, I believe that they are not, but Utah is a signatory to that, and it expressly carves out anti-tampering claims. If they felt that this was the case, that they were settling everything, they would have put different language in both of those agreements. We urge reversal. Thank you. All right. The case of Volkswagen, in-rate Volkswagen, the EPC of Hillsborough County v. Volkswagen is submitted. We thank both parties for their argument in this interesting case.
judges: Tallman, Ikuta, N.R. Smith